IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID STARKS, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 02-cv-1252-JPG |
| | ) |
| MARVIN POWERS, M.D.; DR. | ) |
| WILLIAMS; and TERRY CALIPER, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant Marvin Powers' ("Dr. Powers") motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a)(1) made after the conclusion of Starks' case and renewed following entry of a jury verdict.[1] Plaintiff David Starks, Sr. ("Starks") has filed a *pro se* response to the motion (Doc. 170).

**I.    Background**

This is an action pursuant to 42 U.S.C. § 1983 in which Starks, an inmate at Tamms Correctional Center ("Tamms"), claims that Dr. Powers, the medical director at Tamms, was deliberately indifferent to a serious medical need in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. Starks charged that Dr. Powers was aware that Starks was suffering from a painful vision disorder and that he was deliberately indifferent to his need for eyeglasses. Starks requested damages for physical pain and injury to his vision as well as for the depression he claims stems from the lack of treatment for his vision problems.

The Court conducted a two-day jury trial in Benton, Illinois, on December 19 and 20, 2005. Starks was represented at trial by attorney Jason Crowder, and Dr. Powers was

---

[1] Dr. Powers has not asked the Court for a new trial pursuant to Rule 59.

represented by attorney Theresa M. Powell. Starks called six witnesses in his case-in-chief: Dr. Powers, Dr. Kenneth Clark, Tony Fisher, himself, Kevin Miller and Brian Smith. At the conclusion of Starks' case, Dr. Powers made a motion for judgment as a matter of law pursuant to Rule 50(a)(1), which the Court took under advisement. Dr. Powers then called himself and Michael Williams as witnesses in its case-in-chief. Starks called himself as a rebuttal witness. At the conclusion of the evidence and arguments, Dr. Powers renewed his Rule 50(a) motion, which the Court continued to keep under advisement. The jury then rendered a verdict for Starks in the amount of $275 for physical injury and $425 for emotional injury, for a total verdict of $700. The Court then granted Dr. Powers' Rule 50(a)(1) motion for the following reasons.

## II.     Analysis

Rule 50(a)(1) allows a court to enter judgment as a matter of law during trial whenever "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001). The Court should consider all of the evidence, but must draw all reasonable inferences in favor of the non-moving party and must not make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995)). This standard mirrors the standard for granting summary judgment. *Reeves*, 530 U.S. at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)); *Murray*, 252 F.3d at 887. Thus, the question before the Court is

whether the evidence, viewed in Starks' favor, supports the verdict in his favor on the claim that his Eighth Amendment rights were violated.

A.  Facts

The uncontroverted facts listed in the Final Pretrial Order and the evidence presented at trial, viewed in Starks' favor, established the following:

Tamms is a maximum security facility within the Illinois Department of Corrections. Tamms inmates are confined to their cells most of the day where their range of vision is limited to approximately eight to ten feet. If an inmate has a television, it is on the opposite side of the cell (just about at the maximum viewing range) from the bed. The cell doors at Tamms are solid sheets of steel perforated with a grid of small 1/2-inch holes about one inch apart. There is a concrete wall approximately 20 feet outside the cell doors. Inmates do not have the ability to see anyone unless they are walking down the range. Each cell has a window which provides limited views of nature and other inmates' windows. This is the environment in which Starks' complaints arose.

Starks has worn reading glasses since 1988 and continued to do so when he was transferred to Tamms in late 1998. In fact, he brought two pairs of reading glasses with him to Tamms, but lost those glasses after his property was seized to be searched for security purposes and was returned to him without the glasses. Without his glasses, Starks suffered headaches, tearing and dizziness when he tried to read, which led to depression. Starks filed a grievance over his lack of glasses and was permitted to see an optometrist, Dr. Kenneth Clark ("Dr. Clark"), on May 19, 1999.

During his visit to Dr. Clark, Starks complained that he was having trouble reading without his glasses. Dr. Clark found that Starks' visual acuity for distance was 20/20 in both eyes without glasses. He also found that his near visual acuity (what he can see close up) was J4 in both eyes without glasses, which meant that he was able to read print the size of that normally found in a standard newspaper. Dr. Clark determined that with glasses, Starks' near visual acuity could be corrected to J2 with glasses, which meant that he could then read "very, very small" print. Otherwise, Dr. Clark found that Starks' eyes were normal. Dr. Clark prescribed reading glasses for Starks solely for the purpose of enabling him to reach the J2 near visual acuity level.

As a result of an assault by a Tamms inmate using a shank made from a pair of glasses, Dr. Powers began reviewing all requests for inmate eyeglasses, including Dr. Clark's prescription for Starks. Dr. Powers noted that Starks had 20/20 vision – Dr. Clark's notation about Starks' distance acuity vision – and had since prior eye exams in October 1993 and September 1997. He also considered that Starks had worn reading glasses in the past and that his problems with excessive tearing existed even when he had glasses. He concluded that Starks did not need glasses and refused to authorize them. He did not give great weight to Dr. Clark's findings about Starks' near visual acuity and the potential to improve that acuity, and he did not talk to Dr. Clark before making his decision to deny Starks glasses. When Starks did not get his glasses in the time he expected to get them, he filed a grievance and through the grievance process learned that Dr. Powers had refused to authorize the prescription written by Dr. Clark.

Without his glasses, Starks could not read from a distance and could not see views of nature or other inmates' sign language from his window. He could not read books without extreme strain, which caused his eyes to tear and turn red, gave him headaches and led to

frustration, depression and withdrawal from interactions with other inmates in the wing. When he read, he had to hold the reading materials extremely close to his eyes. As a consequence, he was unable to read law books, mental health department books, or other books from the library that were not in large print (the library had a very limited supply of large-print books). He could also not participate in a religion study course because he could not read the required materials. He was frequently driven to get other inmates to read materials out loud to him.

  Starks continued to complain to Dr. Powers about headaches, excessive tearing, vision blurriness and lack of glasses whenever Dr. Powers made his weekly rounds to the cell blocks and in his annual general health evaluation. Dr. Powers responded in a variety of ways; he walked away or he told Starks either that there was no clinical indication that he needed glasses, that he did not need glasses because he was going blind and glasses would not help him, that he would try to move Starks to a lower level cell so he would not have to worry about falling down the stairs, or that Starks needed to submit a request to see an optometrist using the established protocol for requesting medical attention. When Starks complained of redness in his eyes, Dr. Powers referred that complaint to a nurse for resolution.

  Starks was seen by another optometrist, Dr. Michael Williams ("Dr. Williams"), on September 5, 2001. In that exam, Starks complained of blurry vision at a distance. Dr. Williams found that Starks' near visual acuity was 20/20 when he used both eyes together without glasses and that his visual acuity for distance was 20/30 when he used both eyes together without glasses. He diagnosed Starks with mild myopia, that is, nearsightedness, and found that it was correctable to 20/20 with glasses. Nevertheless, he recommended that Starks not receive glasses because, as an inmate in Tamms, he did not need to see objects at a distance and because

wearing the glasses Starks needed in his cell could worsen his myopia.  Dr. Williams recommended revisiting this decision when Starks is transferred out of Tamms.  Dr. Powers understood Dr. Williams' report to indicate that Starks had normal vision and could read without difficulty.  He was also aware of the diagnosis of mild myopia but relied on and concurred with Dr. Williams' reasoning and recommendation that Starks not be given glasses at that time despite that diagnosis.  Dr. Powers did not talk to Dr. Williams about this exam, and Starks did not receive glasses as a result of his September 5, 2001, exam by Dr. Williams.

In the meantime, Starks' vision got worse.  He filed another grievance and was able to see Dr. Williams again on January 14, 2003.  At that visit, Starks complained of blurry vision that rendered him unable to watch television, headaches, eye redness and a phenomenon whereby it appeared as if something had spilled in his eye.  Dr. Williams found that Starks' visual acuity for distance was 20/25 and his near visual acuity was 20/20 when he used both eyes together without glasses.  He diagnosed trace myopia that was correctable to 20/20 with glasses.  Again, however, he declined to prescribe glasses because Starks' near visual acuity was good.  He attributed the blurriness at television-watching distance to eye strain and recommended that Starks take "visual breaks" to reduce that strain.  Dr. Powers understood Dr. Williams' report to indicate that Starks' visual acuity for distance had improved slightly since his September 2001 exam.  He was aware of the diagnosis of trace myopia and of eye strain and of the recommendation that glasses not be given and that Starks take "visual breaks" to reduce his eye strain.  Dr. Powers did not talk to Dr. Williams about the exam, but  relied on and concurred with Dr. Williams' report and recommendations regarding whether to obtain glasses for Starks.  Starks did not receive glasses as a result of the January 14, 2001, exam by Dr. Williams.

Starks symptoms did not go away, and he continued to complain to Dr. Powers on a weekly basis, with the same type of responses from Dr. Powers.  He did not, however, make a formal request for another optometrist exam using the appropriate protocol since that time, and he has not received any glasses.  Starks took an antidepressant and a sedative and attended weekly therapy sessions to deal with his depression and other mental health issues, although he had stopped taking his medications before the trial of this case.  In order to watch television, he must stand close to the television set.  He cannot see what is on the library cart that is wheeled down the wing to supply inmates with reading material and must rely on other inmates to tell him what is on the cart.  He relies on other inmates to request law materials for him and to read those materials to him out loud.

B.     Application

The Court finds that there was no legally sufficient evidentiary basis for the jury's verdict in Starks' favor on this Eight Amendment claim.  The Eighth Amendment's prohibition on the unnecessary and wanton infliction of pain forbids deliberate indifference to a prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976);  *Zentmyer v. Kendall Co.*, 220 F.3d 805, 810 (7th Cir. 2000).  To prevail on such an Eighth Amendment claim, a prisoner must show (1) that he had an objectively serious medical need and (2) that the official knew that the medical need was serious but disregarded it.  *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000).

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zentmyer*, 220 F.3d at 810 (quotations omitted).  Serious

vision problems may constitute a serious medical need. *See Koehl v. Dalsheim*, 85 F.3d 86, 87 (2d Cir. 1996) ("severe double vision and loss of depth perception" resulting from a prior head injruy; without glasses, eye "shifted fully into the corner of the socket and is almost sightless").

An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference can arise by a failure to provide prompt treatment for serious medical needs or by intentionally interfering with treatment once prescribed." *Chapman*, 241 F.3d at 845-46 (citing *Estelle*, 429 U.S. at 104-05). It can also arise where a treatment decision was a "substantial departure from accepted professional judgment, practice, or standards." *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). However, a mere difference of opinion by medical professionals as to the way a medical problem should be treated, while it may lead to an inference of negligence, does not give rise to an inference of deliberate indifference. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Pardue*, 94 F.3d at 261. The prisoner must show that the defendant's conduct was intentional or criminally reckless; neither simple nor gross negligence is sufficient to establish deliberate indifference. *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991).

### 1. Objectively Serious Medical Need

This question is a close call, but after careful review, the Court finds that the evidence was not sufficient for a reasonable jury to find that Starks had a serious medical need at any relevant time. The evidence showed that following Starks' 1999 visit to Dr. Clark, his vision was close to normal, with the only deficiency being that he was unable to read "very, very small" print without the assistance of glasses. This is hardly the kind of visual problem like the one found to constitute a serious medical need in *Koehl*: double vision and lack of depth perception

that led to the inmate to run into things and fall down. Starks' exam revealed that he could read normal newspaper print and other similar print such as that in standard law books without the assistance of glasses. The fact that Starks had trouble seeing distances and that he suffered pain, tearing and eye redness when reading things close-up did not, in Dr. Clark's opinion, mandate treatment for those symptoms and did not create a situation where it was obvious to a non-optometrist doctor that glasses were needed.

Starks' need as it existed when he saw Dr. Williams in 2001 did not rise to the level of an objectively serious medical need. Dr. Williams diagnosed Starks with mild myopia, but did not find that it "mandated treatment" and, in fact, declined to prescribe glasses based on his assessment of Starks' medical need to see distances while incarcerated at Tamms. There was no evidence that, in view of Dr. Williams' report from this visit, a serious medical need was so obvious that even a non-optometrist doctor like Dr. Powers would easily recognize the need for further medical treatment.

Similarly, Starks' need when he saw Dr. Williams again in 2003 was not objectively serious. His visual acuity was not too different from his vision in 2001, this time being diagnosed with "trace myopia" as opposed to "mild myopia." The diagnosis of eye strain was redressable through "visual breaks," something Starks could do himself without further medical intervention. Again, Dr. Williams did not prescribe glasses, and it was not obvious that his diagnosis and recommendation were wrong.

    2.    <u>Deliberate Indifference</u>

That Dr. Powers was not deliberately indifferent to Starks' needs is much clearer. Dr. Powers did not do all that Starks wanted him to do and may, in some way, have been negligent,

but he was not deliberately indifferent.  In response to Dr. Clark's prescription for glasses, Dr. Powers' reviewed Dr. Clark's current assessment of Starks' distance visual acuity as well as Starks' medical file, including his past visual exams reflecting 20/20 distance visual acuity since 1993 and indicating that Starks suffered from excessive tearing even when he had glasses.  There is no evidence that he knew of and disregarded the fact that Starks could not see "very, very small" print.  Dr. Powers' decision to cancel Dr. Clark's prescription was a reasoned decision in response to the needs presented by the parts of the visual exam report Dr. Powers deemed most important and was not a substantial departure from accepted professional judgment, practice, or standards.  That Dr. Powers did not delve further into Dr. Clark's report to understand and appreciate that Starks' near visual acuity could have been improved by glasses or that he declined to discuss the report with Dr. Clark may amount to negligence, at the most, but not deliberate indifference.

     As for Dr. Powers' various responses to Starks' complaints to him on his weekly rounds and in his annual health evaluation, the Court finds that overall, Dr. Powers was not deliberately indifferent.  He referred Starks to his optometrist exam results, advised him of the proper procedure for another optometrist or nurse visit, approved eye drops recommended by the nurses, and said he would move Starks' cell to avoid a potentially dangerous situation on the stairs.  That Dr. Powers may have walked away from Starks' complaints on occasion or spoken harsh words to him was not sufficient to negate his overall adequate response to Starks' complaints and requests for medical evaluation.

     As for Dr. Powers' responses to Dr. Williams' visual exam report from 2001, the evidence showed that Dr. Powers believed the report to indicate that Starks had normal vision and could read without difficulty.  He also believed Starks had little need to see at great

distances while an inmate at Tamms and that giving glasses to Starks could, in fact, cause his vision to worsen.  His decision to concur with Dr. Williams' recommendation to withhold glasses was a considered decision that appears from the evidence to be within the realm of accepted professional judgment, practice and standards.

Similarly, Dr. Powers' response to Dr. Williams' visual exam report from 2003 was not deliberately indifferent.  Dr. Powers understood the report to mean that Starks' vision had improved since 2001 since his distance visual acuity went from 20/30 to 20/25.  He also understood the report to attribute blurriness in Starks' vision while watching television to eye strain that could be helped by Starks' taking "visual breaks."  He made a reasoned judgment in light of these understandings to concur with Dr. Williams' recommendation to refrain from prescribing glasses for Starks.  Again, this response does not reflect indifference to Starks' vision problems, but simply a disagreement that Starks' visual problems should be treated like Starks wanted them treated.

Finally, when viewed as a whole, the evidence of Dr. Powers' response to Starks' medical needs across the years is insufficient to show that Dr. Powers knew of and disregarded any of Starks' visual problems.  Starks' saw an optometrist three times in under five years.  Dr. Powers encouraged Starks to request further visits if Starks thought they were necessary, and Dr. Powers made reasonable decisions based on medical evidence about the way to treat Starks' vision problems.  No reasonable jury could find that such conduct amounted to deliberate indifference to Starks' medical needs.

**III.     Conclusion**

For the foregoing reasons, the Court finds that Starks did not carry his burden of establishing that he suffered from a serious medical need or that Dr. Powers was deliberately indifferent to his medical needs.  Accordingly, the Court **GRANTS** Dr. Powers' Rule 50(a) motion and **DIRECTS** the Clerk of Court to enter judgment as a matter of law in favor of Dr. Powers.

**IT IS SO ORDERED.**
**DATED:  April 10, 2006**

                                        s/ J. Phil Gilbert
                                        **J. PHIL GILBERT**
                                        **DISTRICT JUDGE**